Filed 3/12/13  P. v. Romero CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054543 |
| v. | (Super.Ct.No. FVI024187) |
| KIRK ALBERT ROMERO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  John M. Tomberlin, Judge.  Affirmed.

Catherine White, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant Kirk Albert Romero guilty of first-degree murder. (Pen. Code, § 187, subd. (a).)[1, 2] The trial court sentenced defendant to prison for an indeterminate term of 25 years to life. Defendant raises six issues on appeal. First, defendant contends the trial court erred by, in the last moments of trial, deciding to instruct the jury on an aiding and abetting theory of guilt that was never discussed or litigated. Second, defendant asserts the trial court erred by not instructing the jury on the lesser included offense of involuntary manslaughter. (§ 192, subd. (b).) Third, defendant contends the trial court erred by not instructing the jury that it could convict defendant of second degree murder if it found defendant did not premeditate the murder or lie in wait for the victim. Fourth, defendant asserts the trial court erred by admitting testimony from a witness who had an agreement with the State. Fifth, defendant contends the trial court erred by not instructing the jury that an accomplice's testimony must be corroborated. Sixth, defendant asserts the trial court erred by not instructing the jury on unanimity. We affirm the judgment.

---

[1] All subsequent statutory references will be to the Penal Code unless indicated.

[2] The jury found not true the allegations that defendant (1) personally used a firearm during the commission of the felony (§ 12022.5. subd. (a)), and (2) personally and intentionally discharged a firearm proximately causing the victim's death (§ 12022.53, subd. (d)). We note the minute order reflects the jury found a gang allegation to not be true (§ 186.22, subd. (b)(1)); however, this appears to be a typographical error, as it does not appear any gang allegations were set forth in the information.

# FACTUAL AND PROCEDURAL HISTORY

A.  <u>THE CRIME</u>

In April 2006, the victim, an adult male, lived in an apartment in Adelanto.  Also living in the apartment were (1) the victim's fiancée (Mother), (2) Mother's mother (Grandmother), and (3) Mother's children.  During April 2006, Mother was hospitalized for kidney issues.  The victim moved into the apartment with Mother's family in approximately February 2006, and helped Grandmother take care of Mother's children.  Mother had a 13-year-old son named Adrian, a 15-year-old son named Fernando (hereinafter "the brothers"), and two other sons.

On April 22, 2006, at approximately 8:00 or 9:00 p.m., Adrian, Fernando, and their cousin were walking through the apartment complex on their way to the brothers' apartment.  The boys were stopped by a group of six or seven individuals, who were having a party in a carport.  Three of the individuals, who were young men, approached the boys and asked where the boys were from.  The boys stopped to hear what the young men were saying.  The young men spoke to Fernando about the Los Angeles Dodgers hat he was wearing.  The young men asked if Fernando was in a gang and why he was wearing the Los Angeles hat.  Fernando recognized one of the young men as a resident of the apartment complex, Jose Villafana (Villafana).  The boys did not respond, and continued walking.

One of the young men, Elias Arzate (Arzate), shoved Fernando.  Fernando told Arzate he had no reason to fight Arzate, and Fernando kept walking to his apartment.

3

Defendant often spent time with Villafana in the apartment complex. Fernando could not recall if defendant was at the carport party, but defendant's friends were at the party.

When the boys arrived at the brothers' apartment, Adrian called Mother at the hospital to tell her about the confrontation with the individuals in the carport. Mother told Adrian to stay inside the apartment. The victim was at the hospital visiting Mother when Adrian called. That night, when the victim arrived home from visiting Mother, Adrian told the victim about the confrontation. The brothers stayed inside the apartment for the rest of the night.

At approximately noon the following day, April 23, the brothers were on their patio, which is surrounded by a wooden fence. Fernando saw Arzate walk by, toward Villafana's apartment. Villafana's apartment was approximately 10 to 15 feet away from the brothers' apartment. Arzate "mad dogged" (confrontationally stared at) the brothers, as Arzate walked through the apartment complex. Adrian told the victim about Arzate staring at him and Fernando. The victim saw "the look" on the brothers' faces. The victim went to Villafana's apartment.

The victim knocked on Villafana's apartment door, and spoke to Villafana and Arzate. The victim told Villafana and Arzate that if they "have any kinds of problems with [his] kids to go and talk to [the victim] about it." Villafana and Arzate looked down as though they were ashamed of their actions—an argument did not take place. The victim returned to his apartment.

The victim was a habitual smoker, who stepped outside the apartment approximately every 30 minutes to smoke a cigarette. At approximately 10:30 p.m., the

4

victim went outside the apartment to smoke a cigarette.  Gunshots were fired.  Fernando called 911 and locked the front door.  Grandmother yelled that she thought the victim was shot.  Adrian woke up, opened the front door, and saw the victim lying in front of the door, face down in a "puddle of blood . . . with his eyes open."  Fernando saw the victim and called 911 again to report the victim was shot.

The brothers turned the victim face-up, and Adrian spoke to the victim, but the victim did not respond.  Approximately 30 seconds after being turned over, the victim stopped breathing.  The victim typically carried a flip-type handyman's knife in his pocket.  Adrian did not see the knife on the ground next to the victim; Adrian believed the knife was still in the victim's pocket.

B.  THE INVESTIGATION

Sheriff's Detective Myler investigated the victim's death.  When Myler arrived at the apartment complex on April 23 he saw the victim was deceased.  Myler noticed two gunshot wounds on the front of the victim's left shoulder, one of which was near the victim's neck, and a third gunshot wound on the victim's right lower back area.  The victim died as a result of the gunshot wounds.

Myler spoke to people in the neighborhood.  As a result of those interviews, Myler identified Villafana and Villafana's friends as possible suspects.  Also as a result of the interviews, Myler checked the fence line on the northern end of the apartment complex to determine if anyone had jumped over it.  Myler found dirt on top of the chain-link fence railing in three different locations, not far from one another.

5

Sheriff's Detective Mahoney also investigated the victim's death. Mahoney spoke to Grandmother and the brothers. After speaking with the family, Mahoney identified Villafana and Arzate as suspects. Villafana was not at his apartment when Mahoney went to speak to him that night. Mahoney began investigating a third possible suspect after speaking to more people; the third suspect was defendant.

The detectives decided to take a break and reconvene later in the day. As four of the law enforcement officers were driving their separate cars in a caravan, Mahoney saw three people walking through a field. The people matched the descriptions of the three suspects: (1) defendant, with a clean-shaven head, Hispanic, and with a somewhat large stature; and (2) Villafana and Arzate who were Hispanic, "smaller," and "skinny." Mahoney used his telephone to call Sheriff's Detective Shenton to assist him in contacting the people in the field.

Mahoney and Shenton stopped their cars in the field, near the three suspects, who were Villafana, Arzate, and defendant. Shenton asked Villafana and Arzate to come over to his vehicle. Mahoney asked defendant to come to his vehicle. The three men "nonchalantly approached" the detectives. Defendant allowed Mahoney to pat him down. Mahoney did not find any weapons. Defendant told Mahoney his name, which matched the first name of the suspect Mahoney was looking for—Mahoney did not have the suspect's last name. Mahoney had never known a Hispanic person by the name of Kirk, so he was surprised when defendant said his name was the same as the suspect's name.

6

Mahoney stepped away from defendant, in order to call Sergeant Bolt (Bolt). Mahoney told Bolt, "[W]e found them. You need to turn around." Bolt had continued on in the caravan when Mahoney and Shenton stopped in the field. Defendant overheard Mahoney and began running away. Mahoney chased after defendant. Defendant ran to his residence. Defendant's girlfriend (Rincon), was standing outside the residence, behind a chain-link fence. Rincon yelled at defendant to stop running.

Defendant ran into his yard, circled the house twice, gave Rincon a kiss, and then jumped over a block wall into an apartment complex. Mahoney instructed defendant to stop running, and followed defendant into the apartment complex. Defendant jumped over a fence into another apartment complex. Mahoney jumped over the fence as well. Mahoney saw defendant enter an apartment. Mahoney called Bolt, who used his radio to direct other deputies.

Uniformed deputies with shotguns entered the apartment. Defendant was handcuffed and escorted out of the apartment. Two other people were inside the apartment; the people inside the apartment were related to Rincon. Defendant was transported to the Adelanto substation to be interviewed. Mahoney went back to defendant's residence to interview Rincon. Rincon agreed to assist Mahoney with looking for a weapon. Rincon walked into the backyard, and Mahoney followed her. Rincon stopped next to one of the ventilation grates on the exterior of the house (the grates are located every 10 feet along the floor area of the house). Rincon pushed her hand through the screen mesh, and the mesh fell back. Rincon pointed Mahoney toward

the area where the mesh fell away. A deputy reached through and pulled out a .357 Magnum revolver wrapped in a shirt.

Mahoney spoke to Rincon's brother (Jose). Jose told Mahoney that late at night on April 22, he saw Villafana holding a revolver. Villafana was in a car stopped along the road, and a another person, whom Jose did not recognize, was also in the car. Jose described the gun, and the description was consistent with the .357 Magnum found at defendant's residence. Jose assumed Villafana and the second person "were up to no good." Mahoney returned to the station to interview defendant, Arzate, and Villafana.

C.  ARZATE'S TESTIMONY

Arzate testified at defendant's trial. Arzate was wearing an orange jumpsuit and was in the custody of San Bernardino County due to murder charges related to the victim. Arzate entered into an agreement with the prosecutor. The agreement contemplated Arzate's truthful testimony against defendant in exchange for entering a plea to manslaughter (§ 192) and a gang enhancement (§ 186.22, subd. (b)(1)). Arzate would receive a prison sentence of 16 years, which could be served outside of California. The trial court stated it did not believe anyone had the authority to promise a prison sentence could be served outside of California. Arzate's plea deal was not solidified prior to his testimony. Thus, if Arzate's testimony were not truthful, the prosecutor could renege on the deal. Arzate expressed concern that his testimony against defendant would lead to him being stabbed in prison and/or Arzate's sister being harmed.

8

Arzate met defendant in February 2006 through Villafana. Arzate supplied methamphetamines to defendant, for defendant to sell. Arzate visited defendant's house on a weekly basis, but they were not friends. Arzate met Villafana in school in 1998 or 1999, and they were friends. Arzate is a member of the 41st Street gang in South Central Los Angeles. Defendant is a member of the Seventh Street West Side Verdugo gang. Defendant's gang nickname is Little Joker. Villafana was possibly a member of the Westside Wilmington gang.

Arzate denied shooting a gun in April 2006. On April 23, 2006, Arzate and Villafana went to Palm Springs during the day. The two returned to Villafana's apartment at approximately 7:00 p.m. When Arzate went outside to get something out of the car, a teenager was "mad dogging" Arzate. Arzate stared back at the teenager and then reentered Villafana's apartment. A few minutes later, the victim knocked on Villafana's apartment door.

Arzate thought the victim was "kind of aggressive" and noticed the knife on the victim's belt. The victim asked Arzate if he had a problem with the victim's "nephew." Before Arzate could answer, the victim asked Villafana if he had a problem with the victim's nephew. Arzate felt disrespected by the victim, because the victim did not give Arzate an opportunity to answer, before questioning Villafana. Arzate asked the victim if the victim's nephew had a problem with them. The victim said, "no." Arzate responded, "[T]here's your answer," and then closed the door. Villafana asked what had happened earlier to cause the victim to come to Villafana's apartment. Arzate said a teenager outside the victim's apartment was looking at Arzate, so he "looked at him

9

back." Villafana and Arzate stayed at Villafana's apartment for one or two hours, and then went to defendant's house to give him drugs.

Upon arriving at defendant's house, Arzate, Villafana, and defendant smoked methamphetamines. The three men discussed the incident with the teenager staring at Arzate and the victim coming to Villafana's house. Arzate told defendant he felt as though the victim was disrespecting him. Defendant "[p]ulled out a gun" from his waistband. Defendant said, "I'll smoke that fool." Arzate said the victim "didn't deserve that." Arzate said he would rather fight the victim, because the victim asked Villafana a question without giving Arzate an opportunity to respond to the previous question. Villafana told the two men to "leave it alone," but also agreed to "jump" the victim. Defendant said he wanted to kill the victim. Arzate later learned defendant had prior problems with the victim.

Arzate became upset because defendant wanted to kill the victim, so Arzate walked outside. After 30 minutes, Arzate went back inside the house. Defendant asked Arzate what he wanted to do, and Arzate said he wanted to fight the victim. Defendant said he would put the gun away. The men continued to smoke, and then went to the victim's apartment complex, in order for Arzate to fight the victim.

Villafana and defendant knew the victim went outside every night at 10:00 p.m. to smoke a cigarette. The three men planned to wait for the victim to exit his apartment to smoke a cigarette. Arzate and Villafana would wait across the street while defendant would wait in the carport area. Defendant would initiate the fight by rushing at the victim. Defendant had a black bandana around his neck and gloves on his hands.

10

Defendant asked Arzate to unscrew three light bulbs in the carport area, and Arzate complied. Villafana stayed hidden across the street.

Arzate began walking back toward Villafana, across the street. While walking, Arzate saw the victim and pointed defendant to where the victim was standing. Arzate saw defendant lift his shirt and pull "something" out. Arzate heard the victim say, "[N]o," and then heard a gunshot. After the first gunshot, Arzate ducked down and thought, "[W]hat the fuck[?]" Arzate stood up, saw the gun in defendant's hand, saw the flare from the gun being shot, heard three more gunshots, and told Villafana they should run. The two men began running and jumped over a fence. Defendant caught up to the men, and ran with them.

The men ran to Arzate's apartment. Defendant removed the bandana, gloves, and his shirt. Arzate put the clothes in a bag and gave the bag to a woman at his apartment. The woman took the bag. The three men then drove around Adelanto "for a little bit." Arzate asked defendant why he killed the victim. Defendant responded that "he wanted [the victim] dead." Villafana was quiet. Arzate told defendant that if Arzate were arrested, then defendant should "stand up for what he did." Arzate was upset with defendant. Defendant told Arzate, "[D]on't trip: That [I] got it." Defendant told Villafana he should have seen the face the victim made prior to dying. Villafana remained quiet. Arzate continued pushing defendant to take responsibility for the offense if the men were arrested. Defendant pulled out the gun and said, "[I] gots (sic) it," and not to worry.

11

The three men returned to defendant's house. Defendant gave Villafana the gun and told Villafana to empty the gun and clean it. Defendant went upstairs with Rincon. Villafana and Arzate spent the night at defendant's house. Villafana returned the gun to defendant. The following day (April 24) at approximately 11:00 a.m., the three men walked to the store to purchase diapers for defendant and Rincon's newborn son, and were arrested during the walk.

Mahoney interviewed Arzate. Arzate was not truthful with the detective during the interview. Arzate told Mahoney he had argued with gang members from La Puente earlier in the day and was at the apartment complex to retaliate against the gang members. Arzate explained he was at the complex during the shooting, but only because he was looking for the gang members. Arzate then changed his story and claimed he was not present at the complex during the shooting, but defendant told him about the killing.

Eventually, Arzate changed his story and admitted being at the apartment complex to confront the victim. Arzate told Mahoney about the victim coming to Villafana's apartment door to talk to them. Arzate identified defendant as the person who killed the victim. Arzate told Mahoney about the bag of clothing and instructed the woman at the apartment to give the bag to the detective.

Arzate was taken into custody in 2006, and remained in custody through defendant's trial in May 2011. After defendant spoke to Mahoney about what happened on the night of the shooting, Arzate suffered fights in jail. Over the years, Arzate has continued to suffer fights in jail due to making a statement to Mahoney. In March 2011,

12

Arzate made the decision to testify against defendant. Arzate made the decision because his cellmate informed him that a note sent through inmates reflected Arzate was supposed to be stabbed. Deputies found the note about Arzate being stabbed and moved Arzate to the administrative segregation unit.

It appeared to Deputy Jarish that the note was sent by someone with the identifying information of "Joker, WSV, Seventh Street." Defendant is a member of the Seventh Street West Side Verdugo gang. Defendant's gang nickname is Little Joker. Deputy Jarish identified defendant as a possible sender of the note.

On April 6, 2011, a few weeks prior to defendant's trial, defendant and Arzate were in a courthouse hallway. Defendant told Arzate he saw a video recording of Arzate informing law enforcement about the victim's murder. Defendant told Arzate "to do right and don't forget that [defendant] knows where [Arzate's] sister lives." Arzate believed defendant was instructing him to not testify. Arzate decided to testify despite the implicit threat because he was tired of fighting. Arzate admitted it was in his best interests to state that the version of the events he testified to on the stand was the truth. Arzate had a teardrop tattoo on his face, which could refer to murdering a person; however, Arzate got the tattoo in 2004 in honor of his Mother's death.

D.    RINCON'S TESTIMONY

Rincon testified at defendant's trial. Rincon stated Arzate and Villafana came over to defendant's house on the night of the shooting—April 23. Rincon fell asleep around 11:00 p.m., while defendant, Arzate, and Villafana were still at the house. However, when Rincon spoke to Mahoney, she told the detective that defendant, Arzate,

13

and Villafana left the house around 9:30 p.m. and they were gone for two to three hours—returning around midnight or 12:30 a.m.

At trial, Rincon testified that the day after the shooting, when deputies arrived at the house, they asked Rincon to look in the yard for the gun. A deputy pointed Rincon to the vent along the house's floorboard and asked her to check it for a weapon. The deputy instructed Rincon to push through the screen mesh, and she complied. Mahoney testified that no one pointed Rincon to the vent, she walked directly to the vent of her own volition.

### E.     DNA EVIDENCE

A San Bernardino County criminalist conducted DNA tests on (1) a fired bullet, (2) a glove, (3) a second glove, (4) the rough portion of a revolver grip, (5) the smooth portion of a revolver grip, and (6) the trigger of a revolver. The criminalist had DNA samples from the victim, defendant, Villafana, and Arzate. DNA from the fired bullet matched the victim; the bullet was recovered from the victim's body. The first glove contained DNA from four different people—three men and one woman. Defendant was "included as being a possible source of a major component in that mixture." The second glove contained DNA from two people—a major donor and a trace donor. The DNA test revealed defendant was "a possible source of the major component in the mixture."

DNA from the rough portion of the revolver grip revealed a mixture of four people's DNA. Defendant was determined to be "a possible major contributor to [the] mixture." The victim, Arzate, and Villafana were excluded as being major contributors.

14

DNA from the smooth portion of the revolver grip reflected two people's DNA, and one of the profiles was consistent with defendant's DNA profile. Villafana and Arzate were considered to be possible minor contributors to the DNA mixture. Defendant was identified as being a possible major contributor to the three-person DNA mixture found on the revolver's trigger. The victim and Villafana were excluded as being possible contributors; Arzate was identified as a possible minor contributor.

## F. FIREARM EVIDENCE

A fired bullet found in the street near the victim's apartment complex also matched the gun located under defendant's house. No fingerprints were found on the revolver located under defendant's house. The gloves Arzate gave to the detectives tested positive for gunshot residue.

## G. BUS RIDE

On January 15, 2010, Deputy Godoy was assisting with transporting defendant and other inmates, by bus, from the courthouse to the jail. Godoy was a passenger on the bus. Defendant was seated behind Godoy, to Godoy's left, approximately three feet away. During the drive, defendant was speaking to a female inmate, Maribel Lopez, who was approximately two feet away from defendant. Defendant introduced himself to Maribel as "Joker." The two began discussing their cases. Maribel was Arzate's girlfriend. Godoy heard defendant say to Maribel, "I'm the shooter."

## H. DEFENDANT'S TESTIMONY

Defendant testified at trial. Defendant explained that when he was speaking to Maribel on the bus, he said to her, "the authori[ti]es were saying that I was the shooter."

15

Defendant did not tell Maribel he was, in fact, the shooter; rather, he was describing the State's allegations against him.

## DISCUSSION

### A. AIDING AND ABETTING INSTRUCTION

#### 1. *PROCEDURAL HISTORY*

Prior to trial, defendant moved to have the prosecutor disclose the theory of guilt he planned to argue at trial concerning the murder charge. During a hearing on the motion, the prosecutor said, "People will announce and state that it's the theory of willful, deliberate, and premeditated murder." Defense counsel asked, "We're not proceeding on aiding and abetting or any other theory other than he's the perpetrator[?]" The prosecutor said, "That's correct."

On the record, the trial court stated it planned to discuss jury instructions with the trial attorneys. Defendant waived his presence, and then "proceedings were held off the record." The following day, the trial court said, "Now, we have discussed jury instructions at length." The trial court remarked that the discussion took place "[o]ff the record." The trial court then asked defense counsel to discuss three specific instructions to which counsel had objected.

The first instruction concerned defendant's testimony. The second instruction related to defendant fleeing after the crime was committed or after being accused of the crime. The third instruction appears to concern the instruction regarding the People's duty to disclose evidence and their failure to disclose a particular exhibit within the

legal timeframe. After discussing the three instructions, the following exchange took place:

"The Court: [Defense counsel], is there an instruction that you think I should not give that I've indicated that I'm going to give?"

"[Defense counsel]: No.

"The Court: Is there an instruction that I'm giving that you object to, other than what's been instructed[3]?

"[Defense counsel]: No.

"The Court: [Prosecutor], is there an instruction that he's requested that I've refused?

"[Prosecutor]: No, your Honor.

"The Court: Is there an instruction that I have indicated that I will not give additionally? Excuse me. That you had requested that I refused?

"[Defense counsel]: No, it was shot down.

"The Court: Is there an instruction that you think I should not be giving, that I am giving?

"[Prosecutor]: No, your Honor.

"The Court: All right. Then, are you ready to argue?

"[Prosecutor]: Yes.

"The Court: Bring the jury in."

---

[3] We infer the word "instructed" should be replaced with the word "discussed."

During closing argument, the prosecutor argued defendant was the shooter who killed the victim—the direct perpetrator of the victim's murder. Defense counsel argued the prosecutor did not prove beyond "anything" beyond a reasonable doubt. When instructing the jury, the trial court gave an instruction on aiding and abetting. (CALCRIM No. 401.) The trial court informed the jury it could find defendant guilty of murder on a theory of aiding and abetting. No objections were raised when the trial court read the aiding and abetting instruction. The jury found defendant guilty of first degree murder (§ 187, subd. (a)), but it found not true the allegations that defendant (1) personally used a firearm during the murder (§ 12022.5, subd. (a)), and (2) personally discharged a firearm causing the victim's death (§ 12022.53, subd. (d)).[4]

---

[4] While it is unclear why the jury returned untrue findings for the two enhancements, one possibility is that the jury did not believe defendant was the direct perpetrator of the victim's death; a second possibility is that the jury feared the resulting prison sentence was too great—during Arzate's testimony, the prison sentence for the enhancements was discussed. During Arzate's testimony, the following exchange took place:

"[Prosecutor]: So if you there's [*sic*] a first degree murder and a firearm, you could get an additional 25 to life if you turned out to be the shooter and they proved it; right?

"[Arzate]: Right.

"[Prosecutor]: So you could be looking at, just off that, 50 to life. You're not getting that; are you?

"[Arzate]: Yeah.

"[Prosecutor]: You are getting that?

"[Arzate]: No, I'm not getting that.

"[Prosecutor]: And you admitted a gang allegation here. First degree murder, firearm, and a gang allegation is 75 to life; isn't it?

"[Arzate]: Yeah."

2.    *ANALYSIS*

Defendant asserts the trial court's act of instructing the jury on the law of aiding and abetting violated his right to due process because (1) the prosecutor did not pursue a theory of guilt based on aiding and abetting, and (2) he was denied effective assistance of counsel.  We disagree.

We begin with the assertion that the trial court erred by instructing the jury on a theory of guilt not presented by the prosecutor.  The People assert defendant forfeited this argument by not objecting to the aiding and abetting instruction at the trial court.  "Generally, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court.  [Citations.]  The rule of forfeiture does not apply, however, if the instruction was an incorrect statement of the law [citation], or if the instructional error affected the defendant's substantial rights.  [Citations.]  '"Ascertaining whether [the] claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." [Citation.]' [Citation.]"  (*People v. Franco* (2009) 180 Cal.App.4th 713, 719.)  As we will discuss, the instruction did not affect defendant's substantial rights.  Therefore, defendant forfeited the claim of error on appeal.

We review the alleged instructional-due process error de novo.  (*People v. Burch* (2007) 148 Cal.App.4th 862, 870 (*Burch*).)  "'[A] court is not precluded from giving any instruction for which there is evidentiary support.  The fact that a party did not

19

pursue a particular theory does not preclude the trial judge from giving an instruction on that theory where it deems such an instruction to be appropriate.' [Citation.]" (*People v. Ardoin* (2011) 196 Cal.App.4th 102, 128.)

In the instant case there was evidence of three people participating in the victim's murder, e.g. the three dirt marks on the fence railing and Arzate's testimony. Arzate testified that defendant was the shooter; however, it was never exactly clear why defendant would want to shoot the victim—the only explanation was some prior unknown problem(s) between the two.

The primary evidence proving defendant was the shooter, as opposed to Villafana or Arzate being the shooter, was Arzate's testimony. Since Arzate is defendant's codefendant, Arzate's testimony against defendant required corroboration. (§ 1111.) The trial court could reasonably conclude that there was not a great deal of direct evidence corroborating the theory that defendant was the shooter; there was the gun at defendant's house and the overheard statement on the bus ride, but the vent where the gun was found was accessible from outside the house and defendant said only a portion of his statement was overheard. Thus, the trial court could reasonably conclude that the jury would find defendant was a participant in the murder, but not the shooter, because Arzate's testimony about defendant being the shooter was corroborated by some evidence, but not overwhelming evidence, and it is unclear exactly why defendant would have killed the victim, as opposed to Villafana or Arzate. In other words, the evidence supports a conclusion that defendant was a participant in the crime,

20

but not the direct perpetrator. As a result, the trial court properly instructed the jury with the aiding and abetting instruction.

Moreover, defendant was not convicted of a separate crime of aiding and abetting. Rather, defendant was convicted only of murder. (See *People v. Prettyman* (1996) 14 Cal.4th 248, 259-260 [describing liability for aiding and abetting].) Thus, the aiding and abetting instruction did not place defendant in the position of having to defend against a previously uncharged crime, rather, aiding and abetting is a theory of the crime of which defendant had been arguing against all along. (See *People v. Ardoin*, *supra*, 196 Cal.App.4th at pp. 125-126 [discussing there not being a due process violation because felony murder is not a separate offense from premeditated murder].) In sum, we are not persuaded defendant's due process rights were violated by the trial court's act of instructing the jury on the law of aiding and abetting.

Next, we examine defendant's ineffective assistance of counsel contention. Defendant asserts the trial court denied him effective assistance of counsel by instructing the jury on a theory that defense counsel did not have an opportunity to defend against, i.e. aiding and abetting. Defendant contends his trial counsel made tactical decisions with the mindset that the only relevant theory was that defendant was the direct perpetrator of the victim's death, and therefore, the trial court's act of presenting an aiding and abetting option to the jury denied defendant effective assistance of counsel.

Defendant's trial counsel argued defendant was not present during the shooting at all, and that the third person involved in the murder could have been Villafana's

21

brother. Defendant's counsel pursued the theory that defendant was not in any way connected to the victim's murder because the prosecution failed to prove "anything" beyond a reasonable doubt. Defendant has not explained how he would have presented a different defense if he had received more explicit notice of the aiding and abetting theory prior to trial. Thus, it is unclear how the trial court denied defendant's counsel the opportunity to defend against the aiding and abetting theory as asserted by defendant. It is also unclear how defendant suffered prejudice as a result of the alleged denial of effective counsel. (See *People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008 [prejudice is a requirement of an ineffective assistance of counsel claim].)

In sum, since defendant has not demonstrated a due process violation or a denial of effective assistance of counsel, we conclude defendant forfeited his instructional contention because he has not demonstrated that the instructional issue affected his substantial rights. Defendant did not object to the trial court's aiding and abetting instruction, nor did he request to reopen his case. Defendant's failure to bring this alleged problem to the trial court's attention forecloses his ability to effectively raise the issue on appeal.

B.     INVOLUNTARY MANSLAUGHTER

Defendant contends the trial court erred by not instructing the jury on the lesser included offense of involuntary manslaughter. (§ 192, subd. (b).) We disagree.

As set forth *ante*, we review alleged instructional errors de novo. (*Burch*, *supra*, 148 Cal.App.4th at p. 870.) "Involuntary manslaughter is a lesser offense of murder, distinguished by its mens rea. [Citation.] The mens rea for murder is specific intent to

22

kill or conscious disregard for life.  [Citation.]  Absent these states of mind, the defendant may incur homicide culpability for involuntary manslaughter.  [Citations.]  Through statutory definition and judicial development, there are three types of acts that can underlie commission of involuntary manslaughter:  a misdemeanor, a lawful act, or a non[-]inherently dangerous felony.  [Citation.] . . .  [F]or all three types of predicate acts the required mens rea is criminal negligence."  (*People v. Butler* (2010) 187 Cal.App.4th 998, 1006.)

Defendant asserts the trial court should have instructed the jury on the lesser included offense of manslaughter because the evidence reflects the possibility that defendant went to the victim's apartment complex only to assault the victim, but either Arzate or Villafana "suddenly and without warning escalated the assault into shooting" the victim.

For the sake of judicial efficiency we will accept as true defendant's premise that the trial court should have instructed the jury on the lesser included offense of involuntary manslaughter.  (See *People v. Breverman* (1998) 19 Cal.4th 142, 154 [trial court has sua sponte duty to instruct "on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present."].)  Accepting this premise as true, we move to a discussion of prejudice.

The failure to instruct a jury on a lesser included offense is not reversible error "unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.  [Citations.]"  (*People v. Breverman*, *supra*, 19 Cal.4th at p. 165.)  The jury was instructed on first degree murder and second degree murder.  The

jury found defendant guilty of first degree murder. Specifically, the jury found (1) the murder was premeditated, or (2) the murder was committed by lying in wait. The jury rejected the theory of second degree murder. Lying in wait and/or willful, deliberate, and premeditated murder are inconsistent with the mens rea of criminal negligence required for involuntary manslaughter. Given that the jury found defendant acted with the specific intent to kill, and rejected the lesser option of second degree murder, we conclude the record does not establish a reasonable probability that the alleged involuntary manslaughter error affected the outcome of defendant's trial.

### C. SECOND DEGREE MURDER

Defendant contends the trial court erred by not instructing the jury on the elements of second degree murder. We disagree.

We review instructional errors de novo. (*Burch*, *supra*, 148 Cal.App.4th at p. 870.) "Murder may be of the first or second degree. While both require malice aforethought, first degree murder requires willful, deliberate premeditation" or lying in wait. (*In re C.R.* (2008) 168 Cal.App.4th 1387, 1393; § 189.)

The trial court gave the jury the following instructions: "Homicide is the killing of one human being by another. Murder is a type of homicide. The defendant is charged with murder." (CALCRIM No. 500.) "The defendant is charged in Count 1 with Murder in violation of Penal Code section 187. To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] AND [¶] 2. When the defendant acted, he had a state of mind call *malice aforethought*." (CALCRIM No. 520, italics added.) The

24

trial court went on to explain the difference between express and implied malice. After giving this information to the jury, the trial court stated that if the jury found defendant guilty of murder, then it would need to determine the degree of the offense. (CALCRIM No. 520.)

As the court continued, it explained the requirements for first degree murder. The court explained the prosecutor was relying on theories of (1) willful, deliberate, and premeditated murder, and (2) lying in wait. (CALCRIM No. 521.) The court explained the legal requirements for both theories. The court then said, "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder *rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder.*" (CALCRIM No. 521, italics added.)

The trial court continued instructing the jury, explaining how the jury should approach the Count 1 verdict forms. The trial court explained the jury had "verdict forms for guilty of first degree murder, guilty of second degree murder, and not guilty." The trial court explained, "You may consider these different kinds of homicide in whatever order you wish, but I can accept a verdict of guilty of a lesser crime only if all of you have found the defendant not guilty of the greater crime." The court then went step-by-step through the process, explaining that if the jury found the State proved first degree murder, then it should sign the first degree verdict form and leave the others alone. The court then explained that if the jury found defendant not guilty of first degree murder, but guilty of second degree murder, then it should complete the second degree murder form and so on. (CALCRIM No. 641.)

The jury instructions, when read together, indicate the trial court instructed the jury on the elements of second degree murder by explaining the elements of a homicide. The trial court then explained the extra elements that need to be proven for a finding of first degree murder. Thus, the jury instructions in this case are not deficient as they relate to second degree murder. The trial court explained the requirements for the offense and the difference between the two degrees. In sum, the trial court did not err.

Defendant asserts the trial court erred because it did not explicitly "tell the jury that if it found [defendant] committed murder, but did not commit premeditated murder or murder while lying in wait, it should return a verdict of second degree murder." Defendant seems to be arguing with the way the instruction was phrased because the trial court did give this information to the jury, but did not use the exact wording suggested by defendant.

The trial court told the jury the elements for second degree murder and the added elements for first degree murder. The trial court also told the jury: "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder *rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder.*" (CALCRIM No. 521, italics added.) The trial court also instructed the jury that if it found defendant not guilty of first degree murder then it should move on to the second degree murder verdict form. In the plain language of the instruction, the trial court informed the jury that if the jury found defendant not guilty of first degree murder then it should consider the lesser offense of second degree murder. Accordingly, we find defendant's argument to be unpersuasive.

26

Defendant asserts his trial counsel was ineffective for failing to "request instructions which would [have] allow[ed] the jury to convict [him] of second degree murder." We find defendant's argument to be unavailing because, as set forth *ante*, the jury instructions did give the jury the option of convicting defendant of second degree murder. Thus, defendant's trial counsel was effective in this regard.

D.      ACCOMPLICE TESTIMONY

Defendant contends the trial court erred by admitting Arzate's testimony because Arzate's agreement with the State placed him "under a strong compulsion to testify in accord with a version of events which the prosecution believed was true." We disagree.

The People assert defendant forfeited this contention for appeal by failing to object to Arzate's testimony on the basis he raises here. The failure to preserve an evidentiary issue by raising it below forfeits the issue for appeal. (*People v. Boyer* (2006) 38 Cal.4th 412, 454.) There is nothing indicating defendant objected to Arzate's testimony on the basis of his testimony being improperly coerced. Accordingly, we agree with the People that the issue has been forfeited. Nevertheless, for the sake of perhaps preventing a future ineffective assistance of trial counsel argument, we will address the merits of defendant's contention.

""""[A] defendant is denied a fair trial if the prosecution's case depends substantially on accomplice testimony and the accomplice witness is placed, either by the prosecution or by the court, under a strong compulsion to testify in a particular fashion." . . . Thus, when the accomplice is granted immunity subject to the condition that his testimony substantially conform to an earlier statement given to police . . . or

27

that his testimony result in defendant's conviction . . . the accomplice's testimony is "tainted beyond redemption" and its admission denies defendant a fair trial. On the other hand, although there is a certain degree of compulsion inherent in any plea agreement or grant of immunity, it is clear that an agreement requiring only that the witness testify fully and truthfully is valid.'" (*People v. Sully* (1991) 53 Cal.3d 1195, 1216-1217, italics omitted.) We review the trial court's evidentiary ruling for an abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 536.)

Arzate testified at defendant's trial. Arzate was wearing an orange jumpsuit and was in the custody of San Bernardino County due to murder charges related to the victim, thus indicating Arzate was defendant's accomplice. (See § 1111 [defining an accomplice].) Arzate entered into an agreement with the prosecutor. The agreement contemplated Arzate's truthful testimony against defendant in exchange for entering a plea to manslaughter (§ 192) and a gang enhancement (§ 186.22, subd. (b)(1)). Arzate would receive a prison sentence of 16 years, which could maybe be served outside of California. Arzate's plea deal was not solidified prior to his testimony. Thus, if Arzate's testimony were not truthful, the prosecutor could renege on the deal.

Arzate's agreement with the prosecution was for his truthful testimony. Arzate's deal did not require him to testify to any particular version of the events other than the truthful version. So, hypothetically, if the truthful version of the events were that Villafana killed the victim, then Arzate's testimony should have reflected those facts. Arzate was not bound to testify that defendant was the shooter, unless that was the truth.

28

As a result, Arzate was not under any compulsion to testify in an invalid manner. Thus, we conclude the trial court did not err by permitting Arzate to testify.

Defendant asserts the trial court erred because Arzate gave five different versions of the events surrounding the victim's death, and then testified to the version that best served Arzate's interests—implicating defendant as the shooter to obtain a plea agreement with the State. As noted *ante*, there "is a certain degree of compulsion inherent in any plea agreement or grant of immunity, [but] it is clear that an agreement requiring only that the witness testify fully and truthfully is valid.'" (*People v. Sully*, *supra*, 53 Cal.3d at pp. 1216-1217, italics omitted) While we agree Arzate's agreement may have involved a certain degree of compulsion, there is nothing indicating that he was required to testify to any particular one version of the five stories he gave the police, in fact, he could have testified to a sixth version of the events so long as it was the truth. Thus, we are not persuaded that Arzate's agreement with the State was coercive to the point of forcing him to testify untruthfully.

### E. CORROBORATION INSTRUCTION

Defendant contends the trial court erred by failing to instruct the jury that accomplice testimony requires corroboration to the extent the testimony concerns an element of a charged offense. We disagree.

The People assert defendant forfeited this issue for appeal by failing to request a modification to CALCRIM No. 335 at the trial court. We agree with the People. A detailed procedural history of the parties' jury instruction discussion with the trial court

is set forth *ante,* so we do not repeat it here in its entirety. The portion of the discussion relevant to this issue of forfeiture went as follows:

"The Court: Is there an instruction that I'm giving that you object to, other than what's been instructed[5]?

"[Defense counsel]: No.

"The Court: [Prosecutor], is there an instruction that he's requested that I've refused?

"[Prosecutor]: No, your Honor."

It appears from the record that defendant did not object to the trial court's version of CALCRIM No. 335. Thus, defendant has not preserved this issue for appeal and should not be raising it here for the first time. Nevertheless, to perhaps detract from the need for a future ineffective assistance of trial counsel argument, we will address the merits of defendant's contention.

As explained *ante*, we review alleged instructional errors de novo. (*Burch*, *supra*, 148 Cal.App.4th at p. 870.) The trial court gave the jury the following instruction, in relevant part: "If the crime of Murder was committed, then Elias Azarte [*sic*] was an accomplice to that crime. [¶] *You may not convict the defendant of Murder based on the statement or testimony of an accomplice alone.* You may use the statement or testimony of an accomplice to convict the defendant only if: [¶] 1. The accomplice's statement or testimony is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the accomplice's statement or testimony;

---

[5] We infer the word "instructed" should be replaced with the word "discussed."

[¶] AND [¶] 3. That supporting evidence tends to connect the defendant to the commission of the crime." (CALCRIM No. 335, italics added.)

The trial court went on to explain the definition of "supporting evidence." In that explanation, the trial court said, "[I]t is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime. [¶] Any statement or testimony of an accomplice *that tends to incriminate the defendant* should be viewed with caution." (CALCRIM No. 335, italics added.)

As set forth *ante*, the trial court instructed the jury any accomplice testimony that would lead to defendant's conviction, or incriminate defendant, needed corroboration. A defendant is convicted or incriminated by committing the elements of a crime. Thus, the jury received the information that any accomplice testimony needed to be corroborated if it implicated defendant as committing an element of a charged offense.

Defendant's argument focuses on the portion of the trial court's instruction reflecting, "3. That supporting evidence tends to connect the defendant to the commission of the crime." Defendant argues this language is incorrect because it does not explain that the corroborating evidence had to be about an element of the offense, but that the corroborating evidence only needed to have the tendency of connecting defendant to the offense. We are perplexed by defendant's argument. What evidence tending to connect defendant to the commission of an offense would not concern an element of an offense? In other words, what else could the trial court have been discussing but evidence reflecting defendant committed the elements of murder?

31

Defendant seems to assert the trial court's instruction should have been written in a plainer or simpler manner. As set forth *ante*, if defendant wanted to modify the language of the instruction then he should have requested the trial court do so—not wait until he reached the appellate court. We will not fault the trial court for delivering required information with perhaps more eloquent terms than defendant would prefer. In sum, the trial court did not err.

F.     UNANIMITY INSTRUCTION

Defendant contends the trial court erred by not instructing the jury on unanimity. Defendant asserts a unanimity instruction should have been given concerning first degree murder because the prosecutor proceeded on the theories of (1) lying in wait, and (2) willful, deliberate, premeditated murder. We disagree.

Our Supreme Court has rejected defendant's precise contention. In *People v. Russell* (2010) 50 Cal.4th 1228, our Supreme Court wrote: "'This court . . . views lying in wait "as the functional equivalent of proof of premeditation, deliberation and intent to kill."' [Citation.] Because lying in wait and deliberate and premeditated theories of murder are simply different means of committing the same crime, juror unanimity as to the theory underlying its guilty verdict is not required." (*Id*. at p. 1257.)

Since we are bound to follow our high court's rulings, we must reject defendant's argument that the trial court erred by not instructing the jury on unanimity. (See *Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455 ["Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction."].)

32

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


MILLER _____

                                 J.


We concur:


RICHLI _____

              Acting P. J.


KING _____

                      J.